CAROLINA KUHN, Respondent, v. JOHN MARQUART, Appellant.

(178 N. W. 428.)

**Breach of marriage promise — action based on breach of valid existing contract.**

1. An action for breach of promise to marry is predicated upon the proposition that the defendant has breached a valid existing contract to marry.

**Breach of marriage promise — burden of showing release from contract is on defendant.**

2. Where defendant sets up as a defense that he has been released from the contract to marry, the burden of proof is on him to show such release.

**Breach of marriage promise — burden of showing subsequent engagement of plaintiff to another held on defendant.**

3. For reasons stated in the opinion, it is *held* that the court's instructions relating to the burden of proof were not erroneous.

**Witnesses — cross-examination as to bastardy proceedings against defendant held not erroneous.**

4. For reasons stated in the opinion, it is *held* that the court did not err in permitting certain questions to be propounded to defendant on cross-examination.

Opinion filed June 5, 1920.

From a judgment of the District Court of Logan County, *Graham,* J., defendant appeals.

Affirmed.

*Arthur B. Atkins, Scott Cameron,* and *W. S. Lauder,* for appellant.

It is well settled that where a woman, under engagement to marry, breaks her contract by engaging herself to marry another man, the fact that the woman was engaged to marry at the time she entered into second contract is no defense in an action brought by the woman against the man who is a party to the second marriage contract. 9 C. J. p. 340, § 32; Albertz v. Albertz (Wis.) 47 N. W. 95; Doubet v. Kirkman, 15 Ill. 622; Roper v. Clay, 18 Mo. 383.

It is now the settled law of this state that where a party to an executory contract gives notice that he will not perform, the other party may treat the contract as at an end or may at once sue for damages for a breach thereof. This rule is applicable to marriage contracts. Zatlin v. Davenport, 71 Ill. App. 292; Kurtz v. Frank, 79 Ind. 594; Adams v. Byerly, 123 Ind. 368, 24 N. E. 130; Halloway v. Griffith, 32 Iowa, 409, 7 Am. Rep. 209; Kennedy v. Roger, 44 Pac. 74; Lewis v. Tapman (Md.) 47 L.R.A. 385; Frost v. Knight, L. R. 7 Exch. 111.

"A release from a marriage contract need not be expressed and may be inferred from the acts and statements of a party inconsistent with the existence of the marriage contract. 9 C. J. p. 331, ¶ 21.

*George M. McKenna* and *Miller, Zuger, & Tillotson,* for respondent.

If a letter properly directed is proved to have been either put into the postoffice or delivered to the postmaster, it is presumed, from the known course of business in the postoffice department, that it reached its destination at the regular time, and was received by the person to whom it was addressed. Rosenthal v. Walker, 111 U. S. 185, 28 L. ed. 395, 398.

If, after knowledge of the conduct and character of the woman, the man continues the original contract in force and makes a new contract to marry, he is bound to perform. Snowman v. Wordwell, 32 Me. 275; Kelly v. Highfield (Or.) 14 Pac. 744; 9 C. J. p. 351, § 6.

Even in a case where a woman has fraudulently concealed from the man the fact of having had a bastard child, and he recognizes his marriage promise after acquiring knowledge of her want of chastity, he is holden. 1 Bishop, Marr. Div. & Sep. § 217, p. 94; Sheahan v. Barry, 27 Mich. 218, 222–3; 9 C. J. p. 364, § 87.

In order to support a defense for release or abandonment of a contract of marriage, the evidence must clearly show that both parties were willing that the contract should be at an end. 9 C. J. p. 362, § 82.

CHRISTIANSON, Ch. J. The plaintiff sued the defendant for the breach of a contract of marriage and alleged, by way of aggravation of her damages, that she had been seduced by him. The defendant admitted the promise of marriage and averred that after such marriage contract had been made the plaintiff promised and agreed to marry one Nick Wolfe, and that by reason thereof the plaintiff broke her contract with the defendant and exonerated him from all obligations to marry the plaintiff. The case was tried to a jury upon the issues thus framed and resulted in a verdict in favor of the plaintiff. Judgment was entered pursuant to the verdict, and defendant has appealed from the judgment.

The undisputed evidence shows that plaintiff and defendant were members of neighboring families. At the time the alleged contract of marriage was made the defendant was about twenty-three years old and the plaintiff about eighteen. The defendant had repeatedly made propositions of marriage to the plaintiff, which she had refused on the ground that she was too young to marry. In the spring of 1916, the plaintiff, however, finally agreed to marry the defendant, and some time thereafter, under such promise of marriage, he seduced her. In the fall of 1916, the defendant went to Bismarck, North Dakota, to attend school. The plaintiff testified that before he left she informed him that she believed she was pregnant, and that defendant then again assured her to have no fear, that he would marry her. It appears that some time after defendant had gone to Bismarck,—to wit, on November 13, 1916,

one Nick Wolfe, accompanied by two other men, came to plaintiff's home, and said Nick Wolfe, through one of the men acting as spokesman, stated to plaintiff's father that said Nick Wolfe desired to marry the plaintiff. The father virtually accepted the proposition, and then submitted it to the plaintiff. The plaintiff testified that she refused to accept the proposal; that her father thereupon took her into another room and scolded her—(the father testified that he "threatened her with a whipping"), and that she finally stated that she would accept the proposal; that at the time she knew she was pregnant as a result of her relations with the defendant, and that she in fact had no intention of marrying Wolfe. Immediately thereafter the plaintiff and Wolfe, accompanied by two men, went in an automobile to the priest, where arrangements were made for an announcement of marriage in accordance with the custom prevailing in the Roman Catholic Church. Upon her return from the priest the plaintiff wrote a letter to the defendant advising him of her plight and pleading with him to come and help her. On the following Sunday, to wit, November 19, 1916, announcement of the engagement of the plaintiff and Nick Wolfe was made by the priest. The defendant was present, but the plaintiff was not in church. She remained at home. Her parents and brothers, however, attended church; and upon their return one of her brothers (several years her senior) found her weeping upstairs. In answer to his inquiry she informed her of her pregnancy. He informed their father. The father flew into a violent rage, and beat her, drove her out of the house and "chased her around the yard." She sought refuge in the barn. Later in the day the defendant was brought over at her request, and some conversation took place between them in the barn. There is positive testimony to the effect that after being informed of the whole situation he told her not to cry; that he would marry her after the child was born, if it "came according to his time." The defendant, however, denies this, and claims that he merely agreed to provide for the child. The defendant also denies that he received the letter written him by the plaintiff, although in other portions of his testimony he says, in effect, that he received it after he came back to Bismarck.

On this appeal defendant contends: (1) That the defendant became released from his agreement to marry the plaintiff by reason of her promise to marry Wolfe; (2) that this result followed regardless of

whether plaintiff's promise to marry Wolfe was obtained through coercion on the part of plaintiff's father, or was made voluntarily by her; (3) that the court erred in instructing the jury that the defendant had the burden of proving that plaintiff's promise to marry Wolfe was made voluntarily; (4) that the court erred in admitting evidence relating to a bastardy proceeding against the defendant.

(1, 2)  An action for breach of promise to marry is, of course, predicated upon the proposition that there was an existing valid contract to marry, which has been breached by the defendant. In determining whether there was such existing and valid contract, recourse must be had to the general principles applicable to all contracts. A valid contract to marry presupposes mutual promises by the parties thereto. "The consent of the parties to a contract must be:  (1) Free; (2) mutual; and (3) communicated by each to the other." Comp. Laws 1913, § 5842. And "an apparent consent is not real or free when obtained through:  (1) Duress; (2) menace; (3) fraud; (4) undue influence; or (5) mistake." Comp. Laws 1913, § 5844; see also 4 R. C. L. p. 154.

The contract to marry creates a recognized status between the parties, and doubtless a subsequent contract by one of the parties entered into to marry some other party constitutes a breach of the first contract, and operates as a release of the other party to the contract. This is so because, of course, the status of the parties fixed by the first contract is wholly inconsistent with the condition created by the second contract. It is unnecessary to determine whether or to what extent the so-called engagement of the plaintiff to Nick Wolfe might have operated, or did operate, as a breach of her contract to marry the defendant. Under the evidence, the jury was entirely justified in finding that the plaintiff never in fact consented to marry Nick Wolfe; that her apparent consent was not real; and that she never had any intention of marrying him. After her return from the priest she immediately notified the defendant of the unfortunate position in which she found herself placed (largely if not wholly through his fault). The jury was also justified in finding that the defendant in due course received the letter which plaintiff wrote him, and hence was fully aware of plaintiff's position at the time he heard the announcement by the priest of plaintiff's and Wolfe's engagement. In fact, in the ordinary course, defendant should

have received such letter before he left Bismarck. The jury was also justified in finding that the defendant renewed his promise to marry plaintiff, on November, 19, 1918, after he was fully aware of everything that plaintiff had done with respect to the so-called engagement to Wolfe. In the circumstances, we do not believe there is any merit in the contention that the court should say, as a matter of law, that the defendant became and is released from his contract to marry the plaintiff.

(3) It is further contended that the plaintiff, and not the defendant, had the burden of proving that the contract between the plaintiff and Nick Wolfe was not voluntary, and that the court erred in instructing the jury that this burden was upon the defendant. It is asserted that the defendant sustained his burden by proving that the plaintiff had in fact promised to marry Nick Wolfe, and that thereupon the burden shifted to the plaintiff to show that the contract to marry was not a valid one.

In this case the contract to marry, and the refusal of the defendant to carry it out, were admitted in the answer, and the defendant as an affirmative defense averred that he was released from such contract by reason of plaintiff's subsequent promise to marry Nick Wolfe. Unquestionably the defendant had the burden of showing that he had been released from his contract to marry the plaintiff. This burden rested upon him throughout the entire case. It is true "the burden of evidence" might shift to the plaintiff, but "the burden of proof" did not; it remained upon the defendant during the entire trial. See Guild v. More, 32 N. D. 432, 466, 467, 155 N. W. 44. "Where plaintiff has established a promise and a breach with loss, a prima facie case is made out, thus throwing on defendant the burden of vindicating himself; and hence it is incumbent on him to prove a release from the engagement or the unchastity of plaintiff subsequent to the promise; and where he relies on the immoral conduct of plaintiff as a defense, it is incumbent on him to prove that he renounced plaintiff on discovering such conduct, and that the contract to marry was broken on account thereof. But it has been held not necessary for defendant to prove a justification of a failure to marry on the particular ground alleged by him. Where defendant sets up a release, the burden of proof is on him to show such release." 9 C. J. p. 350.

In this case defendant's sole excuse for refusing to carry out his contract to marry the defendant was that she subsequently had agreed to marry Nick Wolfe. There is not even an intimation that plaintiff had given any other justification to the defendant for such refusal. She had concededly remained true and loyal to him. The defendant had been making love to the plaintiff for some time. She apparently was quite fond of him, but refused to accept his marriage proposals on account of her youth. Finally she agreed to marry him. Under such promise of marriage, defendant induced her to have sexual intercourse. She became pregnant. These facts are established by the undisputed evidence. The testimony relative to the plaintiff's promise to marry Wolfe, and the circumstances under which it was made, is intermingled with, and discloses, the circumstances under which it was made. The plaintiff had seen Wolfe only once before he made the proposal. He was a stranger to her. She was defendant's betrothed wife. She was carrying his child in her womb. For certain reasons their engagement was known to themselves alone. She first refused Wolfe's proposal; later, she in form, accepted. The circumstances of the acceptance have already been related. Considering the evidence as a whole, we do not believe that reasonable men in the exercise of their judgment and reason could have found that plaintiff voluntarily entered into the agreement to marry Wolfe. We believe the court might well have instructed the jury, as a matter of law, that she did not voluntarily promise to marry Wolfe.

(4) Nor do we believe there is any merit in the contention that the court erred in admitting proof relating to the bastardy proceedings against the defendant. The testimony was admitted under these circumstances: The defendant, on his cross-examination, testified that in the conversation he had with the plaintiff at the barn on November 19, 1918, he told her he would not marry her; but "if she was going to have a child (he) will keep track of that," and "I support it." He was then asked if bastardy proceedings were not brought against him after the child was born. He admitted that such proceedings had been brought; that the court ordered him to pay $15 a month for the support of the child; that he did not pay anything until after the court so ordered, and that he had never given either the plaintiff or the child any-

thing except the payments so ordered. We fail to see any error in permitting such cross-examination.

The judgment appealed from must be affirmed. It is so ordered.